United States District Court
Southern District of New York
-------------------------------------------------------x

Alpha Capital Anstalt,                                        09 CV 670 (LAK)

                      Plaintiff,

    v.

Advanced Cell Technology, Inc.,

                      Defendant.

-------------------------------------------------------x

Defendant Advanced Cell Technology, Inc.'s Memorandum of
Law In Opposition to Plaintiff Alpha Capital Anstalt's Motion
For a Preliminary Injunction and for Preliminary Declarative Relief

Defendant, Advanced Cell Technology, Inc. ("ACTI"), respectfully submits this

memorandum of law in opposition to plaintiff Alpha Capital Anstalt's ("Alpha's") motion for a

preliminary injunction and for preliminary declarative relief.   For the reasons that follow, and for

the reasons set forth in the Affidavit of William Caldwell submitted with this Memorandum,

Alpha's motion should be denied in its entirety.

STATEMENT OF FACTS

ACTI is a biotechnology company focused on applying stem cell technology in the field of

regenerative medicine to bring effective, patient-specific therapies to market.

Alpha is a Liechtenstein corporation with its principal place of business in Vaduz,

Liechtenstein.   Upon information and belief, Bank fur Arbeit und Wirtschaft ("Bawag"), an

Austrian financial group best known for its ties to Refco, is either a significant investor or

controlling shareholder in Alpha.   According to news reports, Bawag-related entities have been

sued on at least six occasions regarding allegations of fraud and stock manipulation.

On or about August 31, 2007, Alpha and ACTI entered into a Securities Purchase

1

Agreement ("SPA") (Exhibit B to Order to Show Cause).   Section 3.1(ii) of the SPA purports to

obtain ACTI's consent to, and acknowledgement of Alpha's market activities.   It provides, in

relevant part:

> (ii)    Acknowledgement Regarding Purchasers' Trading Activity.
> Anything in this Agreement or elsewhere herein to the contrary
> notwithstanding (except for Section 4.16 hereof),1 it is understood and
> agreed by the Company (i) that none of the Purchasers have been asked to
> agree, nor has any Purchaser agreed, to desist from purchasing or selling,
> long and/or short, securities of the Company, or "derivative" securities
> based on securities issued by the Company or to hold the Securities for any
> specified term; (ii) that past or future open market or other transactions by
> any Purchaser, including Short Sales, and specifically including, without
> limitation, Short Sales or "derivative" transactions, before or after the
> closing of this or future private placement transactions, may negatively
> impact the market price of the Company's publicly-traded securities; …
> The Company further understands that and acknowledges that (a) one or
> more Purchasers may engage in hedging activities at various time during
> the period that the Securities are outstanding, including, without limitation,
> during the periods that the value of the Underlying Shares deliverable with
> respect to Securities are being determined and (b) such hedging activities (if
> any) could reduce the value of the existing stockholders' equity interests in
> the Company at and after the time that the hedging activities are being
> conducted.   The Company acknowledges that such aforementioned
> hedging activities do not constitute a breach of any of the Transaction
> Documents.

As set forth in Plaintiff's Memorandum of Law in Support of Its Motion for a Preliminary

Injunction and for Preliminary Declarative Relief ("Memo of Law"), the SPA further included, at

Section 5.15, a provision purportedly obtaining a waiver from ACTI of the defense that a remedy

at law would be adequate (Memo of Law, p. 11).

Pursuant to the SPA, Alpha purchased from ACTI a $376,500 face value Convertible

Debenture on or about August 31, 2007 ("Debenture I") and a $107,930 face value Convertible

Debenture in early April 2008 ("Debenture II") (collectively, the "Debentures").   As set forth in

---

1 Pursuant to Section 4.16 of the SPA, Alpha covenanted that no Purchaser or any affiliate acting on its behalf would
short the ACTI stock from the beginning of the Discussion Time until the deal was first publicly announced.

the Memo of law at pp. 8-9, Section 5(b) of the Debentures provides for a downward adjustment of

the Conversion Price if ACTI thereafter offered or sold any stock at a price lower than the initial

conversion price.    However, Section 5(b) further provided that "Notwithstanding the foregoing,

no adjustment will be made under this Section 5(b) in respect of an Exempt Issuance."    "Exempt

Issuance" is defined in Section 1 of the Debenture 2.

ARGUMENT

POINT I

Alpha Capital Has Not Met the Standard for the Issuance
of a Preliminary Injunction and Preliminary Declarative Relief

A.  The Court Should Apply the Heightened Standard to Alpha's Motion

To obtain a preliminary injunction, a plaintiff must establish: (1) the likelihood of

irreparable harm in the absence of such an injunction, and (2) either (a) likelihood of success on the

merits or (b) sufficiently serious questions going to the merits to make them a fair ground for

litigation plus a balance of hardships tipping decidedly in its favor. *Malletier v. Burlington Coat*

*Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir. 2005).    *See also Freedom Holdings, Inc. v.*

*Spitzer,* 408 F.3d 112, 115 (2d Cir. 2005) ("At the preliminary injunction stage, the only

cognizable harms are those that *cannot be remedied at the end of trial if the movant were to*

*prevail*) (emphasis in original).    In this regard, the "showing of irreparable harm is the single most

important prerequisite for the issuance of a preliminary injunction."    *Reuters Ltd. v. United Press*

*Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990) (citations and internal quotations omitted).

As noted by Alpha in its memorandum of law, a heightened standard is applied where the

preliminary injunction "alter[s] the status quo by commanding some positive act ... [W]e have

held that a mandatory injunction should issue 'only upon a clear showing that the moving party is

3

entitled to the relief requested, or where extreme or very serious damage will result from a denial

of preliminary relief." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34

(2d Cir. 1995).

      Additionally, a heightened standard has also been applied where an injunction-whether or

not mandatory-will provide the movant with substantially "all the relief that is sought." *Abdul*

*Wali v. Coughlin,* 754 F.2d 1015, 1026 (2d Cir. 1985).   As the Court explained in *Tom Doherty*

*Associates:*

> If the use of a heightened standard is to be justified, the term "all the relief
> to which a plaintiff may be entitled" must be supplemented by a further
> requirement that the effect of the order, once complied with, cannot be
> undone. A heightened standard can thus be justified when the issuance of an
> injunction will render a trial on the merits largely or partly meaningless,
> either because of temporal concerns, say, a case involving the live
> televising of an event scheduled for the day on which preliminary relief is
> granted, or because of the nature of the subject of the litigation, say, a case
> involving the disclosure of confidential information. The bottom line is that,
> if a preliminary injunction will make it difficult or impossible to render a
> meaningful remedy to a defendant who prevails on the merits at trial, then
> the plaintiff should have to meet the higher standard of substantial, or clear
> showing of, likelihood of success to obtain preliminary relief. Otherwise,
> there is no reason to impose a higher standard.

*Tom Doherty Associates,* at 35.

      Both grounds for applying the heightened standard are present here.   Alpha does not so

much as attempt to claim that the requested relief -- requiring ACTI to issue 2.5 million shares,

honor all future conversion requests, declare that the conversion price of the ACTI Secured

Convertible Debentures held by Alpha is $.02 per share, subject to further downward adjustment,

and enjoining and restraining ACTI from issuing shares of its common stock to any person or

entity other than Alpha Capital and the holders of ACTI Convertible Debentures, subject to certain

limitations -- simply maintains the status quo (Memo of Law, pp. 1-2).   These remedies, if

4

granted, would clearly alter the status quo, necessitating the application of the heightened standard.   Additionally, if Alpha is granted the relief that it seeks – and in particular, if ACTI is forced to issue shares that it otherwise would not have issued and forgo opportunities to obtain vital funding for the company – any ultimate remedy obtained by ACTI on the merits will be rendered meaningless.

For all of these reasons, the heightened standard should apply.

B. <u>Alpha is not Entitled to Injunctive Relief</u>

1. <u>Alpha Failed to Establish Irreparable Harm</u>

a. <u>Specific Performance is Not Appropriate Where there Exists an Adequate Remedy at Law</u>

In its moving papers, Alpha states that a determination of whether the heightened standard applies is a "distinction without a difference."   (Memo of Law, p.5, fn. 1).   ACTI agrees in that Alpha fails to meet the first and most important prerequisite for the grant of summary judgment – a finding of irreparable harm.   New York law is clear, and Alpha acknowledges, that "as a general rule, irreparable harm is not present when the plaintiff has a claim for money damages."   *Alvenus Shipping v. Delta Petroleum (U.S.A.) Ltd.,* 876 F.Supp. 482, 487 (S.D.N.Y. 1994).   Further, New York law is clear that specific performance is not appropriate where an adequate legal remedy, such as money damages, exists.   *Alpha Auto Brokers, Ltd. v. Continental Inc. Co.,* 728 N.Y.S.2d 769, 770 (2d Dept. 2001).   In this regard, "a contract for the issuance of stock will not be specifically enforced where the remedy at law is sufficient."   *Capa Partners Ltd. v. E-Smart Technologies, Inc.,* 5 Misc.3d 1017(A), 798 N.Y.S.2d 708 (N.Y. Co. 2004).   Indeed, "a contract for the issuance of securities will be specifically enforced [only] where the remedy at law is

5

inadequate such as where the stock is not easily obtainable or its value cannot be readily ascertained." *Id.*

Here, ACTI stock is publicly available and traded on the pink sheets at ACTC.PK.   The stock closed on February 3, 2009 at $0.19 per share.   The price of ACTI at any given moment is readily ascertainable.   Thus, under New York law, specific performance is not an available remedy.

Additionally, Alpha overstates the likelihood that ACTI will be unable to satisfy a money judgment at the end of the case.   ACTI's stock price, which closed at $0.02 as recently as December 15, 2008, has experienced a significant resurgence in 2009, closing at $0.19 on February 3, 2009.   Denying Alpha's motion would not only be beneficial to ACTI, in that it can continue its operations, but would likely benefit *Alpha as well,* as ACTI would be free to continue to implement strategies that have resulted in dramatic improvement in the outlook of the Company.   Indeed, continued operations by ACTI would likely result in compliance with SEC reporting requirements and the ability to issue a proxy for the authorization of more shares – a result that would benefit ACTI and all of its securities holders, including Alpha.

> b.   Alpha Should Not be Permitted to Impose Unduly Oppressive Terms on ACTI

Alpha, having significant experience in financing development stage companies, was well aware at the time it entered the contract that New York law does not provide for specific performance on these facts.   In an attempt to overcome this hurdle, Alpha included a contractual provision whereby ACTI purportedly waived the defense that a remedy at law would be adequate. The Court should refuse to give effect to this provision as unconscionable and void as violative of law and public policy.

6

As a general matter, under New York law, unconscionability requires a showing that a contract is "both procedurally and substantively unconscionable when made," *Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1, 10 (1988).   There must be "some showing of 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party'" *Matter of State of New York v. Avco Financial Service,* 50 N.Y.2d 383, 389 (1980). The purpose of this doctrine is "to ensure that the more powerful party cannot "surprise" the other party with some overly oppressive term" *Avco* at 389.

Further, Courts applying New York law routinely refuse to enforce waiver provisions where to do so would violate law or public policy.   *See Sage Realty Corp. v. Ins. Co. of N. Am.,* 34 F.3d 124, 129 (2d Cir. 1994) (holding provision waiving right to counterclaim unenforceable); *Marine Midland Bank v. CMR Industries,* 159 A.D.2d 94, 104 (2d Dept.1990) ("A secured party's duty to act with due diligence, reasonableness and care may not be disclaimed by agreement").

In the instant case, Alpha, having funded (and ultimately litigated against) many development stage companies, was well aware of the desperation for funding and relative unsophistication of ACTI.   Using this to their advantage, they buried in a 28 page document a "heads-I-win, tails-you-lose" waiver provision which is contrary to New York law and essentially ensures the destruction of the company at the whim of Alpha.   This provision, combined with Section 3.1(ii) of the SPA, in which Alpha apparently seeks to absolve itself from liability for manipulative market practices, is a clear indication of Alpha's motives and the relative bargaining power of the parties.   Alpha should not be permitted to procure, through waiver by a less sophisticated and financially strapped party, a result that is overly oppressive and contrary to law. For this reason, the relief requested in the order to show cause should be denied in its entirety.

7

2.    Alpha Failed to Establish a Likelihood of Success on the Merits

Even if Alpha can establish irreparable harm, they have failed to make a clear showing that they are likely to succeed on the merits.   Indeed, the provisions of the SPA and Debentures themselves, and particularly Sections 3.1(ii), 4.16 and 5.15 of the SPA and Section 5(b) of the Debentures, seemingly intend to create an environment in which a purchaser, in bad faith, could enter into a convertible debenture agreement, fraudulently manipulate a stock price down through opaque market activities, cause the triggering of Section 5(b) of the Debentures, and then demand specific performance, thereby obtaining a windfall at the expense of a company and its other securities holders.

Section 3.1(ii) sets forth a laundry list of activities, including short selling stock, open market purchases that "may negatively impact the market price of the Company's publicly-traded securities," and "hedging activities [that] could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted" that are seemingly antithetical to an agreement to fund a start-up company in good faith.   This manipulative activity is limited only by Section 4.16, in which Alpha covenants to refrain from short selling from the "Discussion Time" until the date of the public announcement. Unbeknownst to an unsophisticated target company, through such manipulative activity, a purchaser could do significant damage to the stock of a target company, causing that company to be in worse financial shape than they were prior to the funding.   When the target company is forced or compelled to issue additional shares to meet its ongoing capital requirements, the purchaser employs Section 5(b) of the Debentures, seemingly entitling it to significantly more

shares than any reasonable target company could have anticipated at the time it entered into the agreement.

These provisions could simply be protection for purchasers, such as Alpha, to protect them in the event a company cannot meet its obligations under the SPA and Debentures.   However, as illustrated above, they also provide a roadmap to be followed by an unscrupulous purchaser to profit from the demise of a cash-strapped start-up company.   ACTI requires significant discovery to determine whether Alpha attempted to exploit the provisions in that manner.   Such a finding, which is wholly consistent with the facts as known to ACTI at this time, would support multiple valid defenses and counterclaims.   ACTI will never have the opportunity to learn the true nature of Alpha's activities if the injunction is granted, as its ability to continue as a going concern will likely be eliminated.   Thus, ACTI respectfully asserts that Alpha has not established a likelihood of success on the merits.

For all of the foregoing reasons, Alpha's order to show cause should be denied in its entirety.

Point II

Alpha Should Be Required To Post a Bond

Federal Rule of Civil Procedure 65(c) provides as follows:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The rare instances where a bond is not required are based upon a finding that no harm will result to defendant as a result of the injunction.  *See, e.g., Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir.1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm").   While there is no specific formula for determining the amount of the bond, it must be sufficient to "guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained."  *Interlink Int'l Fin. Svcs., Inc. v. Block,* 145 F.Supp.2d 312, 314 (S.D.N.Y. 2001).

Here, the harm suffered by ACTI if the Court grants the preliminary injunction requested will be severe and, indeed, potentially fatal to the company.   ACTI will be precluded from funding ongoing operations and, in all likelihood, will cease to exist as a publicly traded company. ACTI is currently precluded from authorizing the issuance of new shares because it is not current on its reporting requirements with the SEC.   However, ACTI is in the process of rectifying this situation and is hopeful that it will be current, and thereby eligible to issue a proxy for the issuance of new shares, in the near future.   ACTI further has access to authorized shares that have been allocated to employees under an Employee Stock Ownership Plan ("ESOP").   These shares, with the approval of the employee or ESOP administrator, as applicable, could be used to obtain

10

additional funding for the company.

At current market prices, the damages suffered by ACTI in the event such relief is granted are at least $8 million in lost funding.   These losses are potentially much greater if ACTI's stock price continues to increase and it meets all reporting requirements, thereby obtaining the ability to issue a proxy for the authorization of additional stock.   Given these factors, and the significant possibility that ACTI possesses valid defenses to this action, ACTI respectfully requests that, in the event that Alpha's motion is granted in whole or in part, they be required to post a bond sufficient to protect ACTI from the catastrophic loss it will incur, in an amount not less than $8 million.

Dated:        New York, New York
              February 4, 2009

                                              BACHNER & ASSOCIATES, P.C.

                                              By: _____
                                                   Michael F. Bachner
                                                   Kevin T. O'Brien
                                                   26 Broadway, Suite 2310
                                                   New York, New York 10004
                                                   (212) 344-7778

                                              Attorneys for Defendant Alpha Cell
                                              Technology, Inc.

11